Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, <br><br> Plaintiffs, <br><br> vs. <br><br> KEITH LANNOM, U.S. Forest Service Deputy Regional Forester; U.S. FOREST SERVICE. <br><br> Defendants. | CV-21- <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## I.  INTRODUCTION

1.    This is a civil action for judicial review under the citizen suit provisions of the Endangered Species Act and the Administrative Procedure Act of the U.S. Forest Service's (USFS) authorizations of the Castles Project (Project) on the Lewis and Clark portion of the Helena-Lewis and Clark National Forest (Forest).

2.    Plaintiffs Native Ecosystems Council and Alliance for the Wild Rockies attest that the decisions approving the Project are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.    Defendants' approval of the Project and corresponding documents or lack thereof as written violate the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest  Management Act (NFMA), 16 U.S.C. §1600 et seq., the Endangered Species Act (ESA), 16 U.S.C. §1531 et seq, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.    Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and the ESA, 16 U.S.C. §1540(g)(4), and/or such other relief as this Court deems just and proper.

## II. JURISDICTION

5.    This action arises under the laws of the United States and involves the

United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

6.     An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

7.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706, and 16 U.S.C. §1540.

8.     Plaintiffs sent Defendants a notice of intent to sue under the ESA on December 22, 2020. Thus, Plaintiffs complied with the 60-day notice requirement for their ESA challenge and this Court has jurisdiction to

review this claim.

9.   Plaintiffs fully participated in the available administrative review processes

for the Project; thus they have exhausted administrative remedies. Thus, the

Court has jurisdiction to review Plaintiffs' APA claims.

### III. VENUE

10.  Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule

3.2(b).  Defendant Lannom  resides in Missoula County, which is within the

Missoula Division of the United States District Court for the District of

Montana.

### IV. PARTIES

11.  Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt,

non-profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems. Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members, many of whom are located in

Montana. Members of the Alliance observe, enjoy, and appreciate

Montana's native wildlife, water quality, and terrestrial habitat quality, and

expect to continue to do so in the future, including in the Project area.

Alliance's members' professional and recreational activities are directly

affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

12.    Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of natural resources on public lands in the Northern Rockies.  Its members use and will continue to use the Helena-Lewis and Clark National Forest for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing.  The Forest Service's unlawful actions adversely affect Native Ecosystems Council's organizational interests, as well as its members' use and enjoyment of the Helena-Lewis and Clark National Forest, including the Project area.  Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

13.    Defendant KEITH LANNOM is the Deputy Regional Forester for Region One/Northern Region of the U.S. Forest Service, and is the decision-maker who denied the administrative objections filed against the Project.

14.    Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is

responsible for the lawful management of National Forests, including the

Helena-Lewis and Clark National Forest.

V. FACTUAL ALLEGATIONS

**A.    Project and Project Area**

15.    The Castle Mountains Project (Project) is located in the Castles Mountains

of Montana – an island mountain range located east of White Sulphur

Springs, Montana.

16.    The Project includes:

a.     1,144 acres of commercial logging in Douglas fir forest, which will

remove 40-60% of the trees, and is referred to euphemistically in the

Project EIS as "thinning,"

b.     1,155 acres of clearcutting in lodgepole pine forest,  referred to

euphemistically in the Project EIS as "regeneration,"

c.     928 acres of modified clearcutting with whitebark pine as the leave

trees, potentially including burning, referred to euphemistically as

"whitebark pine restoration,"

d.     1,799 acres of modified clearcutting, which will remove trees around

designated "leave trees," and is referred to euphemistically in the

Project EIS as  "stand improvement thinning,"

e.     419 acres of pre-commercial logging,  referred to euphemistically as

5

"precommercial thinning,"

    f.    287 acres of commercial and non-commercial logging of all conifer trees in aspen groves, and potentially including post-logging burning, referred to euphemistically in the Project EIS as "aspen restoration,"

    g.    8,778 acres of clearcutting and possible burning to create "meadows," referred to euphemistically as "meadow restoration,"

    h.    8,063 acres of prescribed burning, and

    i.    7 acres of shrub planting.

17.    The Project also includes 45.1 miles of new road construction or re-construction:  9.7 miles of new road construction of temporary roads, 25.7 miles of road reconstruction, and construction of an additional 9.7 miles of new roads on existing trails.

18.    The Project includes a Forest Plan amendment to exempt the Project from two Forest Plan standards that protect elk hiding cover because the Project violates those standards.

19.    The "probable implementation duration for the project" is "five to ten years."

**B.    Procedural Background**

20.    The Forest Service published a Notice of Intent to prepare an EIS for the Project on February 19, 2015.

21.   The draft EIS for the Project was released on March 16, 2018.

22.   On October 23, 2019, the Forest Service denied all public "objections" to the Project through the administrative review process.

23.   The Forest Service signed the ROD authorizing the Project on December 19, 2019.

24.   In the ROD, the  Forest Service chose "Alternative 5," which it represents as "similar to both the proposed action Alternative 2 and Alternative 3," which were analyzed in the EIS.  The chosen action "includes two additional prescribed fire units (FEIS, p. 25.) and boundary alterations to several previously analyzed units within the existing treatment footprints."

25.   The ROD states that although the Helena National Forest and Lewis & Clark National Forest administratively combined in December 2015, management of the lands formerly within the boundary of the Lewis & Clark National Forest are still controlled by the direction found in the 1986 Lewis & Clark National Forest Plan until that Forest Plan is revised.

26.   The ROD states that the Forest Plan amendment for this Project was completed under the 1982 NFMA planning regulations.

27.   The ROD states that the Project would not begin before May 2020.

28.   The Forest Service completed its first ESA consultation for the Project with USFWS on December 11, 2019.

29.    The Forest Service completed its second ESA consultation for the Project

with USFWS on June 12, 2020.

30.    The Forest Service produced a third Biological Assessment for the Project

on February 18, 2021.

**C.    Elk**

31.    Forest Plan Forest-wide Standard C-1(2) mandates:  "Utilize the general

concepts presented in Agriculture Handbook No. 533, Wildlife Habitats in

Managed Forests. . . . When more site specific management

recommendations are available through the Forest  Service or MDFW&P

*those recommendations will be followed*."  (Emphasis added).

32.    The most recent site specific management recommendations available

through the Forest Service and MDFW&P for elk habitat management on

this Forest is "U.S. Forest Service and Montana Department of Fish Wildlife

and Parks Collaborative Overview and Recommendations for Elk Habitat

Management on the Custer, Gallatin, Helena, and Lewis and Clark National

Forests," which is commonly referred to as the "Eastside Assessment."

33.    The Project EIS states that the Eastside Assessment is the "best available

science."

34.    The recommendations of the Eastside Assessment were not disclosed and

followed in the Project EIS.

35.    The Eastside Assessment at page 17 states:  "At the project level an elk habitat effectiveness analysis should be conducted."

36.    The Eastside Assessment at page 17 states:   "In those areas where there is a desire to improve and/or maintain elk habitat use, we recommend maintaining or decreasing road densities that correspond with the desired habitat effectiveness level per Christensen et al. (1993)."

37.    Christensen et al. (1993) states: "Any motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicles and all uses, including administrative use."

38.    Christensen et al. (1993) states: "For areas intended to benefit elk summer range and retain high use, habitat effectiveness should be 70 percent or greater."

39.    Christensen et al. (1993) states: "For areas where elk are one of the primary resource considerations habitat effectiveness should be 50 percent or greater."

40.    Christensen et al. (1993) states: "Areas where habitat effectiveness is retained at lower than 50 percent must be recognized as making only minor contributions to elk management goals. If habitat effectiveness is not important, don't fake it. Just admit up front that elk are not a consideration."

41.    Christensen et al. (1993) states: "Reducing habitat effectiveness should

never be considered as a means of controlling elk populations. A population

over target is not a Forest Service habitat problem."

42.   The Eastside Assessment at page 17 states: "For areas intended to

benefit elk summer range and retain high elk use, habitat effectiveness

related to motorized routes should be 70% or greater."

43.   Figure 1 in Christensen et al (1993) is set forth below:



44.   70% habitat effectiveness is approximately 0.7 miles of road per square

mile.

45.   The Eastside Assessment at page 18 states: "Where travel management

decisions have been made, and consideration was given to habitat effectiveness in the overall decision, *habitat effectiveness analysis at the project level should focus on the additional temporary project routes* and their potential to reduce elk use of important summer habitat." (Emphasis added).

46.    The Eastside Assessment at page 18 states: "consistent, frequently-used non-public routes *or temporary roads* would detract from habitat effectiveness if such roads are used during the summer. The specific situation *should be addressed at the project level* and needs to be interpreted relative to potential for displacement of elk (see Lyon et al. 1985)." (Emphases added).

47.    In the Project EIS, the Forest Service states: "habitat effectiveness will not be calculated for this project" and "there will be no habitat effectiveness analysis conducted for this project."

48.    In the Project EIS, the Forest Service misrepresents the Eastside Assessment to the public: "Based on the Eastside Assessment, *temporary* or administrative *routes can be reasonably excluded from the analyses*; therefore, any impact to big game due to temporary routes used for project activities would be immeasurable and insignificant." (Emphasis added).

49.    Similarly, the Forest Service makes the following misrepresentation in the

Project EIS:  "Habitat effectiveness relates to the effect of motorized routes on elk summer range. The best available science for elk habitat management on National Forests in Montana east of the Continental Divide is the Eastside Assessment (included in project record). *The Eastside Assessment states that temporary routes can be reasonably excluded* from that analysis, and the project proposes no change in open public motorized routes." (Emphasis added).

50.  Forest Plan Forest-wide Standard C-1(4) mandates: "Incorporate recommendations from the Montana Cooperative Elk-Logging Study in the planning of timber sales and road construction projects. These recommendations are listed in Appendix F."

51.  The Project EIS does not disclose or discuss recommendations from the Montana Cooperative Elk-Logging Study, Forest Plan Appendix F.

52.  The Montana Cooperative Elk-Logging Study, Forest Plan Appendix F, states: "Where maintenance of elk habitat quality and security is an important consideration, open road densities should be held to a low level."

53.  The Forest Plan defines a "low" road level to be 0.5 - 1.5 miles/square mile.

54.  The Project area does not keep open road densities to a low level.

55.  The Project file indicates that there are 371.7 miles of roads in the Project area:

| road density by MA in the castle Mountains | | |
| --- | --- | --- |
| data obtained from ARCGIS and exported into excel | | |
| completed december 2018 | | |

| ROUTE_STATUS | (Multiple Items) ⌄ |
| --- | --- |
| SEASONAL | (All) ⌄ |
| | |
| **Row Labels** ⌄ | **Sum of MilesMA** |
| | 135.0106378 |
| C | 33.87578744 |
| D | 87.26850205 |
| E | 58.48159303 |
| G | 27.41598273 |
| H | 3.721741042 |
| J | 0.593355958 |
| L | 25.34357174 |
| **Grand Total** | **371.7111718** |

56.    The Project area is approximately 80,000 acres, which equates to 125 square miles.

57.    371.7 miles of roads in 125 square miles equates to a road density of 3.0 miles/square mile.

58. 3.0 miles/square mile is considered to be a "high" level of roads according to the Forest Plan.

59. Additionally, the Project EIS represents that there are 52.1 miles of motorized trails in the Project area, which the EIS refers to as "jeep trails."

60. 371.7 miles of road plus 52.1 miles of motorized trails equates to 423.8 miles of motorized routes in the Project area.

61. 423.8 miles of motorized routes in 125 square miles equates to a motorized route density of 3.4 miles/square mile.

62. Forest Plan Forest-wide Standard C-1 (5) requires that drainages or elk herd units containing identified summer/fall elk range be maintained at 30 percent or greater effective hiding cover.

63. The Project will not comply with Forest Plan Forest-wide Standard C-1 (5).

64. Of the 19 watersheds that contain summer/fall range in the Castle Mountains, 8 watersheds currently violate the standard and 4 additional watersheds will violate the standard after Project implementation.

65. The Forest Service issued a Forest Plan amendment to exempt the Project from compliance with Forest Plan Forest-wide Standard C-1 (5) so that the Project can continue to remove elk hiding cover.

66. Forest-wide Management Standard C-1 (6) requires: "Manage motorized use on National Forest system lands through the Forest Travel Plan, in

14

cooperation with the public, State of Montana, and other Federal agencies, to reduce effects on wildlife during periods of high stress (hunting seasons and wintering periods). Also see Chapter III and Appendix O. The Montana Fish and Game Commission Road Management Policy and the Forest Service Road Regulations are shown in Appendix G."

67. Appendix O sets forth road density requirements for each Management Area, with the exception of MA D, which was amended by Amendment 19 to a road density of 2.5 miles/square mile:

| | | PUBLIC ACCESS | | | | TRAIL MANAGEMENT | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 MGMT AREA | 2 PRIMARY RESOURCE OBJECTIVE | d MIN Existing | c LOW 0.5 to 1.5 miles | b MODERATE 1.5 to 3.0 miles | a HIGH | a OPEN | b RESTRICTED (Seasonal) | c WILDERNESS | d CLOSED (Year-Round) |
| A | Visual/ Timber | | | X | | | X | | |
| B | Timber/ Range | | | X | | | X | | |
| C | Wildlife/ Timber | | X | | | | X | | |
| D | Range | | X | | | X | | | |
| E | Range/ Wildlife | | X | | | | X | | |
| F | Semi-Prim. Recreation | X | | | | | Jefferson Div X | | Rocky Mtn. Div** X |
| G | Custer Management | X | | | | | X | | |
| H | Developed Recreation | | | | X | | X | | |
| I | Wildlife | | X | | | | X | | |
| J | Municipal Watersheds | | | | | | | | X |
| K | Experimental Forest | X | | | | | X | | |
| L | Locatable Minerals | | | | X | X | | | |
| M | Research Natural Area | | | | | | X | | |
| N | Wilderness Study | X | | | | | X | | |
| O | Timber/Range Rocky Mt. Division | X | | | | | X | | |
| P | Wilderness | | | | | | | X | |
| Q | Recommended Wilderness | | | | | | X | | |
| R | Riparian | * | * | * | * | * | * | * | * |

APPENDIX O                                    ROAD AND TRAIL MANAGEMENT

*  The Riparian Management Area will be managed to be compatible with adjacent road and trail management.
** Except designated routes.

68.    Forest Plan Management Areas C, D, E, G, H, J, L, and R are present in the Project area.

69.    The following map sets forth the location of each Management Area in the Project area:



Figure 42 Castle Mountains Management Area Designations

70.   The following table sets forth the acreage in each Management Area in the

Project:

| Table 62 Applicable Lewis and Clark National Forest Management Areas | | | |
|---|---|---|---|
| Management Area | Acres All Ownership | Acres Forest Service | Management Goals |
| Management Area C | 18764 | 18446.4 | Maintain enhance existing elk habitat by maximizing habitat effectiveness as a primary mgmt. objective. Emphasis toward mgmt. for habitat diversity. Commodity resource mgmt. practiced where compatible with wildlife mgmt. objectives. |
| Management Area D | 19874.7 | 17942.7 | Provide sustained high level of forage production for livestock while protecting, maintaining, improving water, wildlife and other resources. |
| Management Area E | 15757.2 | 11005.7 | Provide sustained high level of forage for livestock and big game animals. |
| Management Area G | 15075.7 | 13571.3 | Maintain and protect Forest resources with minimal investment. |
| Management Area H | 1981.9 | 1673.9 | Provide winter recreation opportunities supported by public and private developments while maintaining other resource values. |
| Management Area J | 4809.2 | 4759.9 | Water quality for municipal use |
| Management Area L | 3596 | 2204.7 | Mineral, exploration, development, production while protecting historical values |
| Management Area R | N/A | N/A | Manage to protect or enhance unique ecosystem values associated with riparian zones. Give preferential consideration to riparian area dependent resources. Timber and range management activities are permitted. |

71.   The following table displays road density in each Management Area, with

the exception that the Forest Service did not assign 135 miles of roads to

any particular Management Area, and therefore road densities are higher

than indicated.  The table also sets forth the required road density as set

forth in Appendix O, as amended by Forest Plan Amendment19:

17

| MA | USFS acres in Project area *** Sq. miles | All acres in Project area *** Sq. Miles | Miles of road | Forest Plan Standard | Mi/Sq.Mi USFS only *** Comply? | Mi/Sq. Mi All lands *** Comply? |
|---|---|---|---|---|---|---|
| MA C | 18,446 *** 28.8 | 18,764 *** 29.3 | 33.8 | Low 0.5-1.5 | 1.2 *** Unclear due to exclusion of 135 miles | 1.2 *** Unclear due to exclusion of 135 miles |
| MA D | 17,942 *** 28.0 | 19,874 *** 31.1 | 87.2 | Amend. 19 2.5 | 3.1 *** NO | 2.8 *** NO |
| MA E | 11,005 *** 17.2 | 15,757 *** 24.6 | 58.5 | Low 0.5-1.5 | 3.4 *** NO | 2.3 *** NO |
| MA G | 13,571 *** 21.2 | 15,075 *** 23.6 | 27.4 | Limit to Existing | 1.3 *** Unclear | 1.2 *** Unclear |
| MA H | 1,673 *** 2.61 | 1,981 *** 3.1 | 3.7 | High +3.0 | 1.4 *** YES | 1.2 *** YES |
| MA J | 4,759 *** 7.4 | 4,809 *** 7.5 | .6 | No roads permitted | 0.1 *** Unclear | 0.1 *** Unclear |
| MA L | 2,204 *** 3.4 | 3,596 *** 5.6 | 25.3 | High +3.0 | 7.4 *** YES | 4.5 *** YES |
| MA R | ? | ? | ? | Adjacent Road & Trails | ? | ? |
| Unassigned | ? | ? | 135 | ? | ? | ? |
| **TOTALS** | **69,600 acres *** 108.8** | **79,856 acres *** 124.8** | **371.1 miles** | **N/A** | **3.4 *** N/A** | **3.0 *** N/A** |

72.    As set forth in the table above, at least two, and potentially five,

Management Areas have road densities that violate the Forest Plan.

73.  In the Project EIS the Forest Service states it is complying with road density requirements but it does not provide any explanation as to how it reached this conclusion.

74.  In particular, the Project EIS does not disclose the methodology or underlying data used by the Forest Service to calculate MA road density for the Project EIS Table 191, nor does it disclose the location of that underlying data and calculations in the Project file.

75.  Additionally, the Project EIS does not provide a map that clearly displays all roads in the Project area.

76.  Forest Plan Appendix G provides further guidance for the management of road densities:  "The Montana Department of Fish, Wildlife, and Parks will use the policy as their guidelines for coordination with land management agencies in dealing with road management considerations."

77.  Forest Plan Appendix G recommends managing road density in conjunction with hiding cover at the following levels:

| Hiding Cover | Open Road Density |
|:---:|:---:|
| 80% | 0.0 - 2.4 mi/sq. mi |
| 70% | 0.0 - 1.9 mi/sq. mi |
| 60% | 0.0 - 1.2 mi/sq. mi |
| 50% | 0.0 - 0.1 mi/sq. mi |

19

78.  The Forest Service refused to disclose and discuss the Forest Plan Appendix
     G Hiding Cover/Open Road Density recommendation in the Project EIS.

79.  The Project does not comply with the Forest Plan Appendix G Hiding Cover/
     Open Road Density recommendation.

80.  Forest Plan Management Area C has the following goal: "Maintain or
     enhance existing elk habitat by maximizing habitat effectiveness as a primary
     management objective."

81.  As noted above, the Forest Service refused to conduct a habitat effectiveness
     analysis for the Project.

82.  Forest Plan Management Area C Standard for Wildlife requires maintenance
     of effective hiding cover percentages by timber compartment at an average of
     40 percent with a minimum of 35 percent for any individual
     sub-compartment.

83.  The Project will not comply with the hiding cover requirement of Forest Plan
     Management Area C Standard for Wildlife.

84.  Of the 7 timber compartments with Management Area C lands in the Castle
     Mountains, 4 currently violate the MA C hiding cover standard, and an
     additional one will violate the standard after implementation of the Project.

85.  The Forest Service issued a Forest Plan amendment to exempt the Project
     from compliance with the hiding cover requirement of  Forest Plan
     Management Area C Standard for Wildlife so that the Project can continue

20

to remove elk hiding cover.

86.    Forest Plan Management Area C Standard for Wildlife also requires:
       "Habitat effectiveness will be positively managed through road management
       and other necessary controls on resource activities."

87.    As noted above, the Forest Service refused to conduct a habitat
       effectiveness analysis for the Project.

88.    Forest Plan Management Area C also requires: "Elk habitat effectiveness
       will be maintained."

89.    As noted above, the Forest Service refused to conduct a habitat
       effectiveness analysis for the Project.

90.    As indicated by the Eastside Assessment, temporary roads will degrade
       habitat effectiveness.

91.    During the five to ten year duration of this Project, habitat effectiveness will
       be degraded rather than maintained.

92.    Montana Fish, Wildlife, and Parks (FWP) submitted comments on this
       Project, which state in part: "Due to current elk populations and distribution
       in the Castle Mountains, special consideration needs to be given to maintain
       or enhance summer/fall elk presence on [National Forest System] lands so
       elk are available to the hunting public on public land during the hunting
       season. This should be taken into consideration when planning the . . . .use
       of temporary roads. . . . FWP strongly recommends that the USFS review

and implement the recommendations detailed in USFS & MFWP

Collaborative Overview and Recommendations for Elk Habitat

Management on the Custer, Gallatin, Helena, and Lewis and Clark National

Forests (2013) when designing treatment options."  The Forest Service did

not disclose this comment to the public in the Project EIS.

93.    FWP comments on the Project further state: "FWP is concerned with current

high open roads density in portions of the Castle Mountains, because of its

effects on wildlife security."  The Forest Service did not disclose this

comment to the public in the Project EIS.

**D.    Old Growth Forest**

94.    The Forest Plan requires: "A minimum of 5 percent of the commercial forest

land within a timber compartment should be maintained in an old growth

forest condition."

95.    The Forest Plan provides the following definition of old growth forest:  "the

following ecological definition will apply to old growth forest on the Lewis

and Clark National Forest: An old growth forest will normally contain the

following characteristics[:]

a.    One or more coniferous species which are climax or long-lived seral

dominants on the site

b.    Two or more layers or age classes

c.    A combined overstory-understory tree canopy closure which averages

60 percent or more

d.    The dominant tree component generally exceeds 13 inches dbh, 50

feet in height, and has reached or is past full maturity with signs of

decadence present and obvious

e.    At least 2 snags/acre of 10 inches dbh or greater

f.    Sparse understory shrub and herbaceous vegetation with logs and

other down material common and well distributed through the stand"

96.    The Final EIS for the Project states: "Most potential project units that

contain mature timber were surveyed for old growth condition during

development of the Castle Mountain Restoration Project during the field

seasons of 2013 through 2016. Technicians were trained to identify plants,

habitat type, measure and age trees, and count number of snags and trees per

acre in various size classes. Old growth condition was determined using

parameters published in Old Growth Forest Types of the Northern Region

(Green et al. 1992, errata 2011 Appendix 3)."

97.    The Final EIS for the Project states: "In several instances, small patches of

old growth trees were found within a stand where the remainder of the stand

did not meet old growth criteria nor was it expected to develop into old

growth within the next 50 years. These small patches (twenty acres in size

or less) were not necessarily reserved from project treatment."

98.    The Final EIS further discloses: "Where individual small patches (generally

23

10 acres or less) of old growth or potential old growth were isolated from other patches, these were not designated for retention."

99.    In the old growth forest section of the EIS, in a sub-section entitled "Information Sources," the FEIS states: "Field survey of proposed project areas are used to support this old growth analysis. Old growth criteria are provided by Old Growth Forest Types of the Northern Region (Green et al. 1992, errata 2011)."

100.   Regarding the Forest Plan requirement to maintain 5% of commercial forest lands in each Timber Compartment as old growth forest, the Forest Service states "we cannot say that this standard is met in every timber compartment . . . ."

101.   The Final EIS acknowledges that, using the Green et al definition for old growth forest, the Project includes "some forest management actions that will affect the composition of old growth and may even reduce it to the point where it no longer meets minimum criteria to qualify as old growth habitat."

102.   In Final EIS Table 221, the Forest Service display acres of either existing old growth or potential old growth, using the Green et al definition, in the Project area Timber Compartments:

| Timber Compartment | Acres of Commercial Timber | Total Acres Surveyed | Total Green et al existing old growth or potential old growth in blocks > 20 acres on commercial lands | Percentage of Green et al existing old growth or potential old growth in blocks > 20 acres on commercial lands |
|---|---|---|---|---|
| 626 | 4118 | 1788 | 61 | 1.5% |
| 627 | 9509 | 5480 | 1022 | 10.7% |
| 628 | 4366 | 3080 | 377 | 8.6% |
| 629 | 5306 | 2863 | 510 | 9.6% |
| 630 | 5694 | 3412 | 435 | 7.6% |
| 715 | 9100 | 2090 | 201 | 2.2% |
| 716 | 8553 | 3195 | 184 | 2.2% |

103. Final EIS Table 221 does not separate out and disclose how much of each Timber Compartment is actual existing old growth under the Green et al definition as opposed to "potential" future old growth under the Green et al definition.

104. Final EIS Table 22 represents that Alternative 2 allows the logging of 451 acres of Green et al old growth in Timber Compartments 627, 628, 629, and 630; however, this calculation excludes all stands under 20 acres as well as all unsurveyed stands, so the true acreage of logging of Green et al old

growth is not disclosed in the Final EIS.

105.   The Final EIS does not disclose the Forest Plan definition for old growth forest.

106.   The Final EIS does not apply the Forest Plan definition of old growth forest.

107.   The Final EIS does not disclose the amount of Forest Plan definition old growth that exists in each Timber Compartment.

108.   The Final EIS does not disclose the amount of Forest Plan definition old growth that will be logged by the Project.

109.   The Final EIS does not disclose which if any Timber Compartments have 5% or more of commercial lands in existing Forest Plan definition old growth.

110.   The field surveys conducted for the Project did not apply the Forest Plan definition old growth forest.

111.   Numerous field surveys conducted for the Project designated areas as old growth even if they did not meet the Forest Plan definition requirement for 60% canopy closure.

112.   Because the field surveys designated areas as old growth that do not contain 60% canopy closure, the field surveys and resulting old growth estimates are not consistent with the Forest Plan old growth forest definition.

113.   The Green et al old growth criteria have three minimum criteria: minimum

age of large trees, minimum number of tress per acre of a certain size (called

diameter at breast height or "dbh"), and minimum basal area.

114.   The table below compares the requirements of Green et al old growth

definition with the Forest Plan old growth definition:

|  | Green et al definition | Forest Plan definition |
|---|---|---|
| Minimum age of large trees | Required | Not required |
| Minimum number of trees per acres of a certain size | Required | Not required |
| Minimum Basal Area | Required | Not required |
| One or more seral dominants on site | Not required | Required |
| Two or more layers or age classes | Not required | Required |
| 60 percent canopy closure at minimum | Not required | Required |
| Dominant tree over 13" dbh and 50' tall | Not required | Required |
| 2 snags per acre at least 10" dbh at minimum | Not required | Required |
| Sparse understory vegetation, shrubs, logs, down material common & well-distributed | Not required | Required |

115.   As demonstrated by the table above, the two old growth definitions have

different requirements: a stand that meets Green et al criteria will not

necessarily meet the Forest Plan definition and vice versa.  Thus, the

application of the Forest Plan old growth definition would lead to a

completely different old growth forest analysis for this Project.

**E.    Municipal Watershed**

116.   Forest Plan Management Area J consists of the two municipal watersheds

on the Lewis and Clark National Forest: O'Brien Creek south of Neihart,

and Willow Creek, southeast of White Sulphur Springs.  Both areas are

forested.

117.   The Project Final EIS acknowledges that there is a Management Area J

municipal watershed in the Project area:  South Fork of Willow Creek.

118.   The Forest Plan requires: "The Montana Department of Health and

Environmental Sciences, Water Quality Bureau, must approve road

construction, timber harvest, and mining activities in municipal

watersheds."

119.   The Forest Plan requires that outside of upper O'Brien Ck, "roads will not

be constructed for surface resource management."

120.   The Forest Plan requires that outside of upper O'Brien Ck, "timber should

only be harvested where necessary to control a hazard to the water

resources."

121.   These three Forest Plan standards were not disclosed and applied in the

Project EIS.

122.   The Project appears to allow timber harvest in Management Area J.

123.   It is unclear whether the Project allows road construction in Management Area J.

124.   There is no documentation in the record to show that Montana DEQ ever approved road construction or timber harvest in this Management Area J municipal watershed.

**F.   Whitebark Pine**

125.   On December 2, 2020, the U.S. Fish and Wildlife Service issued a rule proposing to list whitebark pine (Pinus albicaulis) under the Endangered Species Act.

126.   The Project area includes whitebark pine.

127.   The whitebark pine present in the Castle Mountains represents a major source within the larger geographic area.

128.   Hundreds of acres of clearcutting and burning around individual whitebark pine trees are proposed for the Project, including clearings up to 30 feet in diameter around individual whitebark pines.

129.   The Forest Service fails to disclose the incredibly high failure rate of these practices as a technique for natural regeneration of whitebark pine under these conditions.

130.    The Forest Service states that seedlings may be replanted in clearings, but if
        it occurs at all, at most only on 10 -15% of the cleared acres.

131.    The Forest Service fails to provide any discussion of the high failure rate of
        planting seedlings in clearcuts.

132.    The Forest Service does not disclose or address the results of its only long-
        term study on the effects of tree cutting and burning on whitebark pine. This
        study, named "Restoring Whitebark Pine Ecosystems," included prescribed
        fire, "thinning", "selection cuttings," and "fuel enhancement cuttings" on
        multiple different sites.  The results were that "[a]s with all the other study
        results, there was very little whitebark pine regeneration observed on these
        plots." *See* U.S. Forest Service, General Technical Report RMRS-GTR-232
        (January 2010).  These results directly undermine the representations the
        Forest Service makes in the Project EIS.

133.    More specifically, the Forest Service's own research at RMRS-GTR-232
        finds: "the whitebark pine regeneration that was expected to result from this
        [seed] caching [in new openings] has not yet materialized. Nearly all sites
        contain very few or no whitebark pine seedlings."  Thus, even ten years after
        cutting and burning, regeneration was "marginal."

134.    Moreover, as the Forest Service notes on its website: "All burn treatments
        resulted in high mortality in both whitebark pine and subalpine fir (over

40%)."

135.   Accordingly, the only proven method of restoration of whitebark pine is planting: "Manual planting of whitebark pine seedlings is required to adequately restore these sites."

136.   Similar to its failure to fully disclose and apply RMRS-GTR-232 in the Project EIS, the Forest Service also failed to fully disclose and apply RMRS-GTR-232 in the Biological Assessment it prepared for whitebark pine for the Project on February 18, 2021.

137.   Instead of fully disclosing and applying the findings of RMRS-GTR-232, the Biological Assessment falsely represents: "Natural whitebark pine regeneration is desired and expected to occur following restoration treatments (tree felling and prescribed burning)."

**G.   Goshawk**

138.   The goshawk is designated as a management indicator species in the Forest Plan.

139.   The Forest Plan requires the Forest Service to monitor goshawk nests with a 100% sample annually.

140.   The Forest Plan requires the Forest Service to report the results of this monitoring on an annual basis.

141.   The Forest Plan mandates that the "Variability Which Would Initiate

Further Evaluation" is a "Decrease of 10% or more in active nesting territories."

142. The Forest Plan mandates: "Evaluation of data gathered during monitoring will be guided by the Decision Flow Diagram detailed in Figure 5.1."

143. The Forest Plan mandates: "The document resulting from the use of the Decision Flow Diagram constitutes the evaluation report."

144. The Forest Plan mandates: "The evaluation report will be made available for public review."

145. In the Project EIS, the Forest Service did not disclose the data on active nesting territories and the annual percentage of change as determined by monitoring.

146. Instead, the EIS states: "The number of known territories has increased every year due to survey and monitoring efforts; in 2006 the number of known territories was 40, in 2016 the number of known territories was 85 (see Goshawk Monitoring Summary in project record)."

147. "Known territories" are not the same thing as "active nesting territories."

148. The Forest Service defines "active" as "bird or young in nest."

149. The Project EIS does not disclose how many territories are "active nesting territories."

150. The EIS further states: "There are eleven known goshawk territories in the

project boundary and eight of these were discovered in 2014 or later as a result of project survey. The known territories are Pasture Gulch, Townsend Gulch, West Fork Flagstaff, Checkerboard North, North Fork Whetstone, West Fork Cooper Creek, Reynolds Creek, Warm Springs Creek, Grasshopper Creek, South Fork Willow and Richardson Creek. See Monitoring Summary Table in project record for details on when each territory was discovered and number of fledglings each year, among other details."

151.   The EIS acknowledges that the Project (Alternative 2) will remove 6,231 acres of goshawk post-fledgling habitat.

152.   The EIS acknowledges that the Project (Alternative 2) will remove 8,479 acres of goshawk foraging habitat.

153.   In the section of the EIS discussing Forest Plan compliance, the EIS represents: "The monitoring requirements for old growth habitat (goshawk) is a 100% sample annually for active nesting territories and the variability which would initiate further evaluation is a decrease of 10% or more in active nesting territories. All alternatives comply with this monitoring requirement because there has been no such decrease in active nesting territories, see Northern Goshawk Monitoring Summary 2016 in project record."

154.   Contrary to the EIS representations, the monitoring data in the project file

establishes the following regarding nests Forest-wide:

| FOREST-WIDE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 |
| Number Active | 8 | 15 | 38 | 35 | 28 | 21 | 20 | 14 | 28 |
| Annual % Decrease | -47% | -60% | N/A | N/A | N/A | -8% | N/A | -50% | N/A |

155.   In accordance with the monitoring data in the record, there was a 47%

decline in active nests on the Forest in 2018.

156.   In accordance with the monitoring data in the record, there was a 60%

decline in active nests on the Forest in 2017.

157.   Furthermore, even if the data was limited to the nests in the Project area,

there is still a decrease greater than 10%:

| Territory | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|
| Pasture Gulch | Surveyed No detection | Surveyed No detection | Surveyed Not Active | Surveyed Active |
| Townsend Gulch | Surveyed No detection | Surveyed Active | Surveyed Active | Surveyed Active |
| West Fork Flagstaff | Surveyed Active | Surveyed Active | Surveyed Active | Surveyed Active |

| | | | | |
|---|---|---|---|---|
| **Checkerboard North** | Surveyed Active | Surveyed No detection | Surveyed Active | Surveyed Active |
| **North Fork Whetstone** | Surveyed No detection | Surveyed No detection | Surveyed Active | Surveyed Active |
| **West Fork Cooper Creek** | Surveyed No detection | Surveyed Active | Surveyed Active | Surveyed Active |
| **Reynolds Creek** | Not surveyed | Not surveyed | Surveyed Active | Surveyed Active |
| **Warm Springs Creek** | Not surveyed | Not surveyed | Surveyed Active | Surveyed Active |
| **Grasshopper Creek** | Surveyed No detection | Surveyed No detection | Surveyed Active | Surveyed No detection |
| **South Fork Willow** | Not surveyed | Not surveyed | Surveyed Active | Surveyed Active |
| **Richardson Creek** | Surveyed No detection | Surveyed Active | Surveyed Active | N/A |
| **Active Nests Total** | **2 Active Nests** | **4 Active Nests** | **10 Active Nests** | **9 Active Nests** |
| **Annual % Decrease** | **-50%** | **-60%** | **N/A** | **N/A** |

158.  In accordance with the monitoring data in the record, there was a 50%
    decline in active nests in the Project area in 2018.

159.  In accordance with the monitoring data in the record, there was a 60%
    decline in active nests in the Project area in 2017.

160.  The Project EIS does not disclose the decline in active nests Forest-wide in

2017 or 2018.

161.  The Project EIS does not disclose the decline in active nests in the Project

area in 2017 or 2018.

162.  The Project EIS representations and/or implications that the Forest Plan

goshawk active nest monitoring trigger was *not* reached in 2017 or 2018 are

false.

163.  The Forest Service did not publish an evaluation report for the 2017 and

2018 goshawk active nesting territory declines as required by the Forest

Plan.

**H.  Inventoried Roadless Area**

164.  The western portion of the Project area is located within the Castle

Mountains Inventoried Roadless Area.

165.  The Project allows tree-cutting in this Inventoried Roadless Area across

1,962 acres of "meadow restoration," i.e. modified clearcutting and burning

units, 844 acres of "whitebark pine restoration," i.e. modified clearcutting

and burning units, 14 acres of "aspen restoration," i.e. modified clearcutting

and burning units, and 69 acres of "stand improvement thinning," i.e.

modified clearcutting, for a total of 2,889 acres of tree cutting in an

Inventoried Roadless Area.

166.  The Project also authorizes 3,659 acres of prescribed burning in the

Inventoried Roadless Area.

167.   The Project EIS represents: "The goal of meadow restoration is to create grass and shrub dominated meadow conditions and distribution which are more similar to historic conditions."

168.   The Forest Service's 2011 Castle Mountains Landscape Assessment states that grasslands/shrublands have a natural range of variability of 14.4% to 92.0% in the Castle Mountains, and existing grasslands/shrublands constitute 24.6% of the area.  Accordingly, grasslands/shrublands are currently within the natural historic range of variability.   This fact is not disclosed to the public in the Project EIS.

169.   The Forest Service's 2011 Castle Mountains Landscape Assessment states that whitebark pine has a natural range of variability of 0.3% to 0.8% in the Castle Mountains, and existing whitebark pine constitutes 3.6% of the area. Accordingly, whitebark pine has not declined below the natural historic range of variability.   This fact is not disclosed in EIS.

170.   The Forest Service's 2011 Castle Mountains Landscape Assessment states that aspen has a natural range of variability from 0.7% to 8.6% in the Castle Mountains, and existing aspen is less than 0.0%.  Thus, aspen has declined below the natural historic range of variability.

171.   However, there is no support for cutting down trees as a remedy for aspen

declines because the primary cause of aspen decline is grazing.  Cutting down trees will increase grazing, not reduce it.

172. Regarding wildfire, the Forest Service's 2011 Castle Mountains Landscape Assessment states:  "a majority of the stands (46%) are in condition class 1 or within the natural fire regime, followed by 28% in high departure, and 26% in moderate departure."

173. The Project EIS does not provide the public with a map of Fire Regime Condition Classes.

174. However, the Meagher County Community Wildfire Protection Plan (CWPP) provides a map of "Fire Regime Condition Class" or "FRCC."

175. Fire Regime Condition Class 1 means the area is within natural range for wildfire conditions.

176. The Meagher County FRCC map shows Class 1 in yellow, Class 2 in green, and Class 3 in red.

177. Below, Plaintiffs have superimposed a blue polygon on the Meagher County FRCC map to roughly approximate the Castle Mountains IRA, and arrows to approximate the locations where the majority of IRA tree-cutting will occur:

//



178. As demonstrated by the map above, the majority of IRA tree-cutting appears to be within yellow zones representing FRCC Class 1 areas, i.e. areas that are within the natural range of variation for wildfire conditions.

179.   The fact that the majority of acreage proposed for whitebark pine and

meadow tree-cutting within the IRA is located within a FRCC Class 1

designation was not disclosed to the public in the Project EIS.

VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

*The Forest Service's representations and/or omissions in the EIS regarding road density and elk habitat violate NEPA, and the Project violates the Forest Plan, in violation of NEPA, NFMA, and the APA.*

180.  All previous paragraphs are incorporated by reference.

181.  The Forest Service's refusal to conduct an analysis of habitat effectiveness for the Project violates NEPA and NFMA.

182.  The Project violates the Forest Plan requirement to maintain habitat effectiveness in violation of NFMA.

183.  The Forest Service's refusal to disclose and discuss the recommendations of Forest Plan Appendix F and G as applied to this Project, in the Project EIS, violates NEPA and NFMA.

184.  The Project violates the Forest Plan road density limits for at least two Management Areas, and potentially five Management Areas, in violation of NFMA.

185.  The Forest Service's failure to disclose/reference the underlying data and methodology it used to calculate road density in the Project EIS violates

NEPA.

186.  The Forest Service's failure to fully and fairly disclose the concerns of FWP

regarding high road density in the Project area, in the Project EIS, violates

NEPA.

## SECOND CLAIM FOR RELIEF

*The Forest Service's failure to use the Forest Plan definition of old growth, and*

*consequent failures to demonstrate compliance with Forest Plan old growth*

*standards for retention and viability, violates NFMA, NEPA, and the APA.*

187.  All previous paragraphs are incorporated by reference.

188.  As discussed above, the Forest Plan sets forth a specific definition for old

growth forest.

189.  As discussed above, the Forest Service did not use the Forest Plan definition

of old growth forest for the Project analysis.

190.  Instead of using the Forest Plan definition, the Forest Service used a different

definition of old growth forest – Green et al old growth definition.

191.  As discussed above, the Green et al definition of old growth leads to a

different result than the use of the Forest Plan definition of old growth.

192.  The Forest Service's failure to use the Forest Plan definition of old growth

renders it impossible to determine (a) whether the Project area currently

complies with Forest Plan old growth retention standards, and (b) whether

logging is proposed in areas that will violate the Forest Plan old growth

retention standards after Project logging.  In other words, the entire old growth analysis for the Project area is invalid until the Forest Service applies the Forest Plan old growth definition.

192.  As recently held by the Ninth Circuit, the Forest Service's failure to apply a forest plan old growth definition violates NFMA.  *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1116-17 (9th Cir. 2018).

193.  The Forest Service's failure to take a hard look at this issue in the EIS and failure to fully and fairly disclose the Forest Plan old growth definition to the public in the EIS violates NEPA.

194.  As the Ninth Circuit has held time and time again, the "scope of review does not include attempting to discern which, if any, of a validly-enacted Forest Plan's requirements the agency thinks are relevant or meaningful.  If the Forest Service thinks any provision of the . . . Plan is no longer relevant, the agency should propose amendments to the . . .Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents."  *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005).

## THIRD CLAIM FOR RELIEF

*The Forest Service's failures to disclose and demonstrate compliance with the*

*Forest Plan requirements for the affected municipal watershed violate NEPA,*

*NFMA, and the APA.*

195.   All previous paragraphs are incorporated by reference.

196.   The Forest Plan requires: "The Montana Department of Health and

Environmental Sciences, Water Quality Bureau, must approve road

construction, timber harvest, and mining activities in municipal

watersheds."

197.   The Forest Plan requires that in the affected municipal watershed, "roads

will not be constructed for surface resource management."

198.   The Forest Plan requires that in the affected municipal watershed, "timber

should only be harvested where necessary to control a hazard to the water

resources."

199.   The Forest Service did not disclose these three requirements in the Project

EIS, nor did it demonstrate compliance with these three requirements, in

violation of NEPA and NFMA.

## FOURTH CLAIM FOR RELIEF

*The Forest Service failed to fully and fairly disclose and apply the best available science on whitebark pine regeneration in both the Project EIS and the Project Biological Assessment, in violation of NEPA, NFMA, the ESA, and the APA.*

200. All previous paragraphs are incorporated by reference.

201. NEPA requires scientific integrity and disclosure of opposing scientific viewpoints in an EIS. 40 C.F.R. §§ 1502.9(b); 1502.24.  In violation of NEPA, the Forest Service failed to disclose to the public, in the Project EIS, the fact that the treatments proposed for whitebark pine regeneration are highly likely to fail according to the agency's only long term research study on the effects of cutting and burning treatments on whitebark pine regeneration – RMRS-GTR-232.

202. Similarly, the Forest Service has failed to define the whitebark pine regeneration techniques in the Forest Plan, failed to base the whitebark pine regeneration techniques on technical and scientific literature (RMRS-GTR-232), and failed to ensure the proposed practice will actually result in regeneration, in violation of NFMA.  36 C.F.R. §§ 219.15, 219.27(b).

203. Finally, the Forest Service has failed to fully and fairly disclose and apply the findings of RMRS-GTR-232, which is the best available science on how cutting and burning impact whitebark pine regeneration, in the Biological

Assessment in violation of the ESA mandate to use the best available science**.**

## FIFTH CLAIM FOR RELIEF

*The Forest Service's failure to disclose the decrease in active goshawk nesting territories to the public in the EIS, and failure to comply with Forest Plan requirement to conduct an evaluation report if active nests decline by 10% in a year, violates NEPA, NFMA, and the APA.*

204. All previous paragraphs are incorporated by reference.

205. The Forest Service's failure to disclose the decline in active nesting territories to the public in the EIS violates NEPA.

206. The Forest Service's failure to prepare an evaluation report in response to the annual decline of over 10% in active goshawk nesting territories in both 2017 and 2018 violates NFMA, and its omission of this information in the Project EIS and representation that no such trigger had been reached was misleading in violation of NEPA.

## SIXTH CLAIM FOR RELIEF

*The Forest Service's representations and/or omissions in the EIS and authorizations regarding tree cutting in an Inventoried Roadless Area, violate NEPA, the APA, and the Roadless Rule.*

207. All previous paragraphs are incorporated by reference.

208. The Project allows 2,889 acres of tree cutting in an Inventoried Roadless Area.

209. The origins of the Roadless Rule date back over four decades, when in 1972 the Forest Service embarked on a Roadless Area Review and Evaluation project ("RARE I") to identify roadless areas on National Forest lands and determine their suitability for designation as Wilderness.

210. As part of this effort, the Forest Service inventoried approximately 56 million acres that it deemed suitable for designation as Wilderness.

211. After the RARE I inventory was successfully challenged under NEPA, it was abandoned.

212. Four years later, the Forest Service began a more extensive Roadless Area Review and Evaluation project ("RARE II"), which also created an inventory of roadless areas that the Forest Service deemed suitable for designation as Wilderness.

213. Relying on this inventory, Congress designated approximately 35 million acres as Wilderness.

214. Areas that were identified as roadless during the RARE II inventory ("inventoried roadless areas" or "IRAs"), but were not subsequently designated as Wilderness by Congress, continued to be managed pursuant to each National Forest's individual forest plan.

215.  In the late 1990s, the Forest Service revisited its road-management policy,
      noting that: (1) use of the National Forests had "shifted substantially toward
      recreation," (2) there were insufficient funds to maintain existing roads, and
      (3) there was an "accumulation of new scientific information" suggesting
      that "ecological impacts from existing roads are more extensive than
      previously thought."

216.  On March 1, 1999, the Forest Service published an Interim Roadless Rule,
      which established an 18–month moratorium on road construction in IRAs.

217.  Subsequently, on January 12, 2001, the Forest Service published the final
      Roadless Rule. 66 Fed. Reg. 3244 (Jan. 12, 2001).

218.  The Roadless Rule states in part:

> Prohibition on timber cutting, sale, or removal in inventoried
> roadless areas.
>
> (a) Timber may not be cut, sold, or removed in inventoried
> roadless areas of the National Forest System, except as
> provided in paragraph (b) of this section.
>
> (b) Notwithstanding the prohibition in paragraph (a) of this
> section, timber may be cut, sold, or removed in inventoried
> roadless areas if the Responsible Official determines that one
> of the following circumstances exists. The cutting, sale, or
> removal of timber in these areas is expected to be infrequent.
>
>> (1) The cutting, sale, or removal of generally small diameter
>> timber is needed for one of the following purposes and will
>> maintain or improve one or more of the roadless area
>> characteristics as defined in § 294.11.

47

(i) To improve threatened, endangered, proposed, or sensitive species habitat; or

(ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period;

(2) The cutting, sale, or removal of timber is incidental to the implementation of a management activity not otherwise prohibited by this subpart;

(3) The cutting, sale, or removal of timber is needed and appropriate for personal or administrative use, as provided for in 36 CFR part 223; or

(4) Roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after the area was designated an inventoried roadless area and prior to January 12, 2001. Timber may be cut, sold, or removed only in the substantially altered portion of the inventoried roadless area.

36 C.F.R. § 294.13 (2005).

219.   The Roadless Rule further explains subsection (b)(2) as follows: "Paragraph

(b)(2) allows timber cutting, sale, or removal in inventoried roadless areas

when incidental to implementation of a management activity not otherwise

prohibited by this rule. Examples of these activities include, but are not

limited to trail construction or maintenance; removal of hazard trees adjacent

to classified road for public health and safety reasons; fire line construction

for wildland fire suppression or control of prescribed fire; survey and

maintenance of property boundaries; other authorized activities such as ski

runs and utility corridors; or for road construction and reconstruction where

allowed by this rule."  66 Fed. Reg. 3258 (Jan. 12, 2001)

220.   For over 15 years, the Roadless Rule was the subject of litigation.  *See e.g.*

*Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1126 (9th Cir. 2002);

*California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1007 (9th

Cir. 2009); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1272 (10th Cir.

2011); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 962

(9th Cir. 2015) (*en banc*); *Alaska v. United States Dep't of Agric.*, 273 F.

Supp. 3d 102, 108–12 (D.D.C. 2017).  Nonetheless, the Roadless Rule is

still in effect.

221.   In order to avoid the prohibition against tree cutting in an IRA, in this case,

the Forest Service relies on the exemption at (b)(1)(ii): "To maintain or

restore the characteristics of ecosystem composition and structure, such as

to reduce the risk of uncharacteristic wildfire effects, within the range of

variability that would be expected to occur under natural disturbance

regimes of the current climatic period."

222.   However, that exemption requires a showing that a project area needs tree-

cutting in order to stay "within the range of variability that would be

49

expected to occur under nature disturbance regimes . . . ." *Id.*

223.   In this case, the Forest Service's own landscape assessment for the area found that grassland/shrubland areas are within the natural range of historic variability; therefore creating new grasslands/shrublands, i.e. tree cutting on 1,962 acres for "meadow restoration," is not required as framed by this limited exception to the Roadless Rule.  This fact was not disclosed to the public in the EIS.

224.   Additionally, the Forest Service's own landscape assessment for the area found that whitebark pine has not declined below the historic range of variability; therefore increasing the prevalence of whitebark pine, i.e. tree cutting on 844 acres for "whitebark pine restoration," is not required as framed by this limited exception to the Roadless Rule  This fact was not disclosed to the public in the EIS.

225.   Also, although aspen has declined below the historic range of variation, the Project only includes 14 acres of aspen "restoration" in the entire IRA.

226.   Furthermore, the Meagher County Community Wildfire Protection Plan provides a map of "Fire Regime Condition Class."  Class 1 means the area is within natural range for wildfire conditions.  The map shows that the majority of the IRA that is proposed for tree-cutting under "whitebark pine" cutting or "meadow" cutting is actually within Class 1, i.e. within natural

range of variation for wildfire conditions.  This fact, and this map, were not disclosed to the public in the Project EIS.

227.  For these reasons, tree-cutting on almost 3,000 acres in the IRA is not necessary to maintain "the range of variability that would be expected to occur under nature disturbance regimes," and therefore Exception (b)(1)(ii) to the Roadless Rule does not apply here.

228.  The Forest Service also offers an alternative rationale in the Final EIS, when it claims that Exemption (b)(2) applies.

229.  However, Exemption (b)(2) does not apply because tree cutting is not "incidental" to a management activity here; tree cutting is the management activity.

230.  The Forest Service's misrepresentations and/or failure to disclose key facts to the public in the EIS regarding natural range of variability violate NEPA and the APA.  Additionally, the Forest Service's decision to allow tree-cutting over almost 3,000 acres in an Inventoried Roadless Area that has not experienced significant departure from historic conditions, but instead has a majority of the area within historic range, violates the Roadless Rule and the APA.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the following relief:

A.     Declare that the Project violates the law;

B.     Either vacate the Project decision or enjoin implementation of the Project;

C.     Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or under EAJA; and

D.     Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 1st Day of March, 2021.

_/s/ Rebecca K. Smith_
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Plaintiffs