IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, | CV 21–22–M–DWM |
| Plaintiffs, | OPINION and ORDER |
| vs. | |
| KEITH LANNOM, United States Forest Service Deputy Regional Forester and the UNITED STATES FOREST SERVICE, | |
| Defendants. | |

This case challenges the United States Forest Service's ("Forest Service") authorization of the Castle Mountains Restoration Project (the "Project") on the Helena-Lewis and Clark National Forest. (Doc. 1.) Plaintiffs are environmental organizations that claim the Forest Service violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Roadless Rule in approving the Project. Because some of Plaintiffs' challenges have merit, remand to the agency is required.

## BACKGROUND

The Castle Mountains Project is located east of White Sulphur Springs, Montana. *See* B2b:0004748 (Figure 1); B5a:0005787. It is intended to "move the

1

Castle Mountains toward a more resilient forest and grassland ecosystem" that both addresses the area's departure from desired vegetation conditions and "reduce[s] the threat of high intensity wildfire." B5a:0005787; *see also* B2b:0004752. "This would be accomplished through a variety of management tools including mechanical thinning, tree restoration and regeneration, and prescribed fire." B2b:0004730. Although the parties dispute the "description" of the various timber treatments, (*see* Doc. 18 at ¶ 2), the Project proposes the following:

| Treatment | Acres |
|---|---|
| Stand Improvement Thinning | 1,799 |
| Pre-commercial Thinning | 419 |
| Quaking Aspen Restoration | 287 |
| Meadow Restoration | 8,778 |
| Prescribed Fire | 8,063 |
| Shrub Planting | 7 |
| Total acres proposed for treatment | 22,550 |

B5a:0005789. The Project also includes 45.1 miles of new road construction or reconstruction, B5a:0005789, but authorizes no new permanent roads and "complies with the current travel management covered under the [2007 Travel Management Plan]." B2b:0004753; B5a:0005790. Project activities are anticipated to last five to ten years. B2b:0005271.

The administrative history for the Project goes back to 2011. "As a result of ongoing infestations of mountain pine beetle and spruce budworm at epidemic levels, the Forest Service initiated a landscape assessment to evaluate existing

2

conditions, desired future conditions, and identify possible management practices that were completed in 2011." B2b:0004730; *see also* B2b:0004749–51. After determining that existing conditions departed from desirable fire conditions, the agency began to develop the proposed action in 2013. B5a:0005788. On February 19, 2015, the Forest Service published a Notice of Intent to prepare an Environmental Impact Statement ("EIS"). B5a:0005798. A draft EIS proposing two action alternatives was published on March 16, 2018, and, following a public comment process, three additional action alternatives were considered. B2b:0004730; *see* B2b:0004730–34 (summarizing the five alternatives). The Forest Service issued a Final EIS on July 24, 2019, *see* B2b:0004727–5459; B2c:0005460–577; B2d:0005578–79 (errata), and signed a Record of Decision ("ROD") authorizing Alternative 5 on December 19, 2019, *see* B5a:0005784–817.

On March 1, 2021, Plaintiffs filed the present action, alleging that the Forest Service violated NEPA and NFMA by failing to properly analyze elk habitat and road density (Claim One); violated NEPA and NFMA by failing to demonstrate compliance with the Forest Plan's old growth and goshawk standards (Claims Two and Five); and violated NEPA and the Roadless Rule by authorizing tree cutting in an Inventoried Roadless Area (Claim Six). (Doc. 1.) Although Plaintiffs initially also raised claims related to the municipal watershed (Claim Three) and whitebark pine regeneration (Claim Four), they have since been withdrawn. (*See* Doc. 14 at

52.)  Summary judgment briefing was completed in September 2021, and oral

argument took place on March 31, 2022.

**LEGAL STANDARDS**

## I.    NEPA

"Congress enacted NEPA to establish a national policy for the

environment." *Mtn. Comms. for Fire Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir.

2022).  NEPA "imposes procedural requirements" that are intended to "protect[]

the environment by requiring that federal agencies carefully weigh environmental

considerations and consider potential alternatives to the proposed action before the

government launches any major federal action." *Native Village of Point Hope v.

Jewell*, 740 F.3d 489, 493 (9th Cir. 2014) (quotation marks omitted).  Among other

things, "NEPA requires that federal agencies prepare an EIS for any 'major Federal

actions significantly affecting the quality of the human environment.'" *Id.*

(quoting 42 U.S.C. § 4332(2)(C)).  "The agency must draft an EIS, notice it for

public comment, respond to the comments, and then make an ultimate decision."

*Mtn. Comms. for Fire Safety*, 25 F.4th at 674.  "NEPA itself does not mandate

particular results, but simply prescribes the necessary process." *Robertson v.

Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

## II.    NFMA

"NFMA creates a two-step process for the management of our national forests." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) ("*Native Ecosystems Council II*").  First, the Forest Service must develop, maintain, and, as appropriate, revise Forest Plans, which provide a framework for where and how certain activities can occur in national forests.  *Id.*; *see also* 16 U.S.C. § 1604(f)(1).  Second, the Forest Service must ensure that all individual projects within a forest are "consistent with each forest's overall management plan." *Native Ecosystems Council II*, 428 F.3d at 1249; *see also* 16 U.S.C. § 1604(i).  Thus, the basis for forest plan compliance must be set forth with such clarity to be understandable. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005) ("*Native Ecosystems Council I*").

In the context of this case, although the Helena National Forest and the Lewis & Clark National Forest were administratively combined in December 2015, management of lands formerly within the boundaries of the Lewis & Clark National Forest are still controlled by the direction found in the 1986 Lewis & Clark National Forest Plan until that Forest Plan is revised.  B5a:0005795.

## III.   APA

Actions under NEPA and NFMA are evaluated under the standards set forth in the Administrative Procedure Act ("APA"), which authorizes a court to "hold unlawful and set aside agency action, findings and conclusions found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *see Native Ecosystems Council v. Marten*, 883 F.3d 783, 788 (9th Cir. 2018). Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where the administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is appropriate. *City & Cnty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").

## ANALYSIS

Although not all of Plaintiffs' claims succeed on the merits, they have identified shortcomings in the Forest Service's environmental review that require further consideration by the agency. That said, this record indicates the Forest Service expended a significant amount of time and effort in assessing the Project, which should not be overshadowed by the specific deficiencies identified herein.

6

## I.      Administrative Exhaustion

The Forest Service first argues that Plaintiffs either failed to raise their claims during the administrative review process or failed to adequately plead them, and therefore cannot do so now.  Because the Forest Service is correct in part, summary judgment is granted in favor of the agency on Claim Two and narrow aspects of Claims One and Six as outlined below.

Under the APA, Plaintiffs are required to exhaust the available administrative remedies before bringing their claims in federal court.  5 U.S.C. § 704.  "Statutes and regulations governing the Forest Service reiterate the administrative exhaustion requirement." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (citing 7 U.S.C. § 6912(e) and 36 C.F.R. § 215.20).  But claimants need not use "precise legal formulations," and may "alert[] the decision maker to the problem in general terms." *Id.*  Basically, "[c]laims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met." *Id.*  However, exhaustion requires "objection," not just comments. *See* 36 C.F.R. §§ 218.1–218.16.  Pursuant to those provisions, "[o]bjections must be filed in writing," *id.* § 218.8(a), and "[i]ncorporation of documents by reference is not allowed," *id.* § 218.8(b).

7

Here, Plaintiffs' involvement in the administrative process includes pre-Project comments in 2013, *see* E8:0010124–27; scoping comments in May 2015, *see* E34:0010183–90; comments on the Draft EIS in 2018, *see* B1k:0004155–79, B1l:0004180–208; and objections from September 2019, *see* B4e:0005715–69. The Forest Service argues that all of Plaintiffs' claims that are being pursued here—Claims One, Two, Five, and Six—were not exhausted in this process. They are addressed in turn.

### A.    Claim One

Claim One alleges that the Forest Service violated NFMA and NEPA by not complying with the elk habitat effectiveness standards and road density limitations articulated in a document commonly known as the "Eastside Assessment." (*See* Doc. 1 at ¶¶ 180–86.) According to the Forest Service, Plaintiffs' comments and objections never once mention the Eastside Assessment or unauthorized roads, nor do they contend that the Project violated road density standards. Although the Forest Service is correct that Plaintiffs' comments and objections are not as targeted as their current challenge, they were sufficient to alert the agency "to the problem in general terms." *Rittenhouse*, 305 F.3d at 965.

According to the Forest Service, Plaintiffs' comments regarding elk habitat effectiveness and road density are limited to two pages and are focused on only one management area. *See* B1l:0004192–93. While that characterization of that

specific comment is correct, the substance of the comment lines up with the current challenge: does the Project meet elk habitat effectiveness standards at the levels recommended for Management Area C?  Plaintiffs' 2018 comments also raise the concern that elk habitat effectiveness percentages do not meet the best available science (Christensen et al (1993)), B1k:0004160, which is that used in the Eastside Assessment.  Plaintiffs' 2018 comments specifically reference concerns regarding road density, B1k:0004156, and the implications of the 2007 Travel Plan, *see* B1l:0004201–02.  They also reference road density concerns in Management Area C, B1l:004192–93, as well as the agency's failure to address the State's concerns; *see also* B1k:0004155 (indicating EIS must include comments from state agency); B2c:0005534 (agency response regarding state comments).

Plaintiffs' 2019 objections express specific concern as to how road density—specifically temporary roads—will impact elk habitat effectiveness as it is conceptualized in a 2013 "white paper," *see* B4e:0005765, which is the Eastside Assessment.  The Forest Service undeniably understood Plaintiffs' objection, as its response references the Eastside Assessment by name.  *See* B2c:0005528, 5542; *see also* H14:0055948 ("The objector also contends that the FEIS did not appropriately use the document '[Eastside Assessment]' . . . .").  Likewise, the agency cited the Project's compliance with the 2007 Travel Plan in response to

road density inquiries. *See* B2c:0005497. Thus, Plaintiffs' habitat effectiveness, temporary roads, and road density challenges were properly exhausted.

Nevertheless, the Forest Service argues that any challenge based on illegal roads is waived because it was not pled here. That argument is persuasive. "Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint give the defendant fair notice of what the plaintiffs' claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006). Here, the Complaint focuses on the Project's failure to account for temporary roads in its road density calculations. (*See* Doc. 1 at ¶¶ 45–93.) While part of that claim questions the agency's road density calculation overall, (*see, e.g., id.* at ¶¶ 55–61, 71–75), the Complaint makes no reference to "illegal" or "closed" roads. Given that there are entire cases premised on an agency's consideration of such roads, *see All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188 (D. Mont. 2019), this omission meant the Forest Service was not given fair notice of such a challenge. Accordingly, summary judgment is granted in favor of the Forest Service on this narrow part of Claim One.

## B. Claims Two and Five

Claims Two and Five allege that the Forest Service violated NFMA and NEPA by failing to use the old growth definition from the Forest Plan and by failing to properly report on the northern goshawk, a management indicator species

for old growth.  (*See* Doc. 1 at ¶¶ 187–94, 204–06.)  The Forest Service

persuasively argues that Plaintiffs failed to exhaust the former but not the latter.

Plaintiffs' administrative objections regarding old growth focus on the

paucity of such growth in the forest and the Forest Service's alleged "failure to

inventory old growth to meet forest plan standard."  B4e:0005742.  Absent from

that challenge is any specific reference to the Forest Service's definition of "old

growth" in this context.  To the contrary, Plaintiffs' comments specifically

advocate the use of the definition (Green et al. 1992) that was applied here: "The

project will violate the NEPA if there are no valid surveys for old growth habitat

within each project area, *as identified by Green et al. 1992.* . . ."  B1k:0004164; *see*

*also* B1k:0004165 (same).  And Plaintiffs' other comment criticizes the Forest

Plan's old growth standards, stating "[t]he Forest Plan direction for old growth is

30 years outdated," B1l:0004198, and it "lacks inclusion of more current science,"

B1l:0004199.  Plaintiffs' current challenge—i.e., that the Forest Service should

have used the Forest Plan definition rather than Green et al. 1992—therefore

contradicts the position they took during the administrative process.  As a result,

Claim Two was not exhausted.

As for goshawk, the Forest Service argues that Plaintiffs' comments were

limited to "generalized concerns regarding how the Project would impact goshawk

foraging habitat," not the specific monitoring challenge raised now.  (Doc. 17 at

15.)  Plaintiffs raised numerous comments and objections related to the goshawk. E34:0010185; B1l:0004188–90; B4e:0005718, 5734, 5747–48, 5751–64.  While the Forest Service is correct that most of these challenges center on "post-fledgling areas," with particular focus on the "foraging habitat," Plaintiffs persuasively argue that the present challenge—i.e., the agency's failure to report a decrease in active nesting territories—was not known because it was not disclosed in the decision documents.  *See* B2b:0005313 ("All alternatives comply with this monitoring requirement because there has been no such decrease in active nesting territories, see Northern Goshawk Monitoring Summary 2016 in project record.").  Additionally, Plaintiffs' comments identify continued concern with the EIS's evaluation of nesting habitat, with an emphasis on the importance of accurate monitoring.  *See* E34:0010185 ("The Forest Plan requires that goshawk populations be monitored.  What is the current population trend on the Forest, and how will this be affected if territories in the Castle Mountains are abandoned due to this project?"); B4e:0005752–55; *see also* B1k:0004168 (requesting that the agency "disclose whether you have conducted surveys in the Project area for . . . northern goshawk . . . as required by the Forest Plan").  Contrary to the Forest Service's characterization, this is not like *Native Ecosystems Council v. Weldon*, where the plaintiffs "conjured new claims and arguments on summary judgment." 2011 WL 13193257, at *15 (D. Mont. June 7, 2011).  If anything, Plaintiffs'

12

present goshawk claim is significantly *narrower* than that presented during the

administrative process.  (*See* Doc. 1 at ¶¶ 154–63.)  Claim Five was exhausted.

   C.   **Claim Six**

   Finally, Claim Six alleges that the Project violates the Roadless Rule (a

regulation prohibiting road construction and tree cutting in certain areas) and that

the record does not explain how the Forest Service will implement Project activity

in the Inventoried Roadless Area.  (Doc. 1 at ¶¶ 207–30.)  The Forest Service

argues that this claim was not raised in Plaintiffs' comments or objections and that

the second argument was not pled; the agency is correct as to the latter.

   In their 2018 comments, Plaintiffs requested the Forest Service "[d]isclose

how [the] Project complies with [the] Roadless Rule," B1k:0004159, and they

challenged the agency's justifications for "restoration," B11:0004181–85.  As it

relates to the specific claims here, the 2018 comment also specifically reference a

misrepresentation of the "level of grassland/shrublands," B11:0004184, question

how the Forest Service will be able to access treatment units, B11:0004185, and

assert that "[t]here is no map of the roadless area expanse" and an existing maps

are "extremely difficult to read," B11:0004186–87.  In response, the Forest Service

argues that even if this challenge was articulated in the comments, it was not

preserved in the objections.  *See* 36 C.F.R. § 218.14(a).  That is not accurate,

however, as Plaintiffs' 2019 objections specifically allege a violation of the

13

Roadless Rule, *see* B4e:0005717, and question how the treatment units will be

accessed in the Roadless Areas, B4e:0005730, 5738.  Plaintiffs also consistently

argue that the agency is using "restoration" terminology to hide the true purpose of

the action: timber management, B4e:0005724.  And once again, the agency's

response to Plaintiffs' comments and objections indicates that it understood the

nature of the challenge.  *See* B2c:0005513.

Nevertheless, the Forest Service persuasively argues that Plaintiffs' access

challenge was not properly pled.  Although raised during the administrative

process as discussed above, this specific challenge is not in the Complaint.  *See*

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008)

("[W]here, as here, the complaint does not include the necessary factual allegations

to state a claim, raising such a claim in a summary judgment motion is insufficient

to present the claim to the district court.").  Summary judgment is therefore granted

in favor of the Forest Service on this narrow part of Claim Six.

## II.    Road Density and Elk Habitat (Claim One)

Plaintiffs first argue that the Project analysis of elk habitat violates NEPA

and NFMA by failing to comply with elk habitat effectiveness standards and road

density limitations.  The Forest Service disputes the applicable standards but

maintains that even if Plaintiffs' standards govern, "the Project follows them, and

thus complies with NFMA and NEPA."  (Doc. 23 at 15.)  The Forest Service

further maintains that the Project is consistent with the road density requirements outlined by the 2007 Travel Management Plan and that because the Project does not create any permanent roads, it will not affect road density considerations. Plaintiffs persuasively argue that the Project raises both habitat effectiveness and road density concerns that the agency did not adequately consider.

## A.    Elk Standards

The first issue as it relates to elk is what standards apply.  The Forest Plan contains two relevant elk habitat effectiveness standards.  "Habitat Effectiveness refers to the percentage of available habitat that is usable by elk outside the hunting season."  B2b:0005229.  First, "Habitat Effectiveness will be positively managed through road management and other necessary controls on resource activities." A1:0000122.  Second, the Forest Plan requires that in the management of all areas and trails, "[e]lk habitat effectiveness will be maintained."  A1:0000125.  But these requirements only apply to Management Area C, with is only one of eight Management Areas in the Project area.  B2b:0005453.

Plaintiffs argue that in addition to the above standards, the Project must also comply with the recommendations outlined in the Eastside Assessment.  Plaintiffs' argument is premised on Forest Plan Standard C-1(2), which states: "When more site specific management recommendations [for various wildlife habitat situations] are available through the Forest Service or [Montana Department of Fish, Wildlife

and Parks] those recommendations will be followed." A1:0000054. According to Plaintiffs, the most recent site-specific management recommendations available are set forth in the Eastside Assessment. B2b:0005251; F1_446:0032192–227. And the Project EIS concedes—as did the agency at oral argument—that "[t]he best available science for elk habitat management on National Forests in Montana east of the Continental Divide is the Eastside Assessment[.]" B2c:0005527.

The Forest Service argues, however, that the Eastside Assessment is not a "site-specific management recommendation" as envisioned by the Forest Plan, *see* A1:0000054, noting the introductory language in the Eastside Assessment: "These are recommendations only, and the group is not making decisions or setting policy for either agency in this effort," F1_446:0032192. According to the agency, "[s]urely, such a clear, narrowly-drawn statement overcomes the forest plan's general directive to follow recommendations." (Doc. 17 at 21.) But Plaintiffs have the better argument because the Forest Plan's plain language encompasses "recommendations," *see* A1:0000054, which is exactly what the Assessment purports to be, *see* F1_446:0032192. That conclusion is only reinforced by the "Plan Compliance" documents in the record, which state that Forest Plan Standard C-1(2) was met for the Project because the "[b]est available science was used to assess project affects to wildlife and important habitat resources." G18a:0054998. As mentioned above, the Project EIS recognizes the Eastside Assessment as the

16

best available science in this context.  *See* B2c:0005527.  Plan compliance was also

premised on incorporating site specific recommendations provided by the Montana

Fish, Wildlife and Parks, *see* G18a:0054998, which specifically recommended

implementation of the Eastside Assessment, *see* E28:0010173.

Accordingly, the Project analysis must consider the recommendations

outlined in the Eastside Assessment in addition to the Forest Plan Standards.

**B.     Habitat Effectiveness**

Plaintiffs first argue that the Project EIS fails to analyze habitat effectiveness

or show that the Forest Service is maintaining habitat effectiveness, in violation of

NEPA and NFMA.  Specifically, Plaintiffs argue that the Forest Service refused to

conduct a habitat effectiveness analysis and misrepresented the impact of

temporary roads.  Plaintiffs are correct on both fronts.

According to the Project EIS, a site-specific analysis of elk habitat

effectiveness was not required because "this project proposes no changes to the

2007 Travel Plan decision," B2b:0005229, and "[t]he Eastside Assessment states

that temporary routes can be reasonably excluded from this analysis," *see*

B2c:0005527.  But the Eastside Assessment specifically contemplates project-

specific analysis of habitat effectiveness and temporary roads, even if a travel plan

is in place: "Where travel management decisions have been made, and

consideration was given to habitat effectiveness in the overall decision, habitat

17

effectiveness at the project level should focus on the additional temporary project routes and their potential to reduce elk use of important summer habitat." F1_446:0032209. The Assessment further states: "consistent, frequently-used non-public routes or temporary roads would detract from habitat effectiveness if such roads are used during the summer. The specific situation should be addressed at the project level and needs to be interpreted relative to potential for displacement of elk." F1_446:0032209 (citation omitted).

In response, the Forest Service highlights that the Project only adds roads that are non-public and temporary, "which are presumably less intensive than either of the examples quoted above." (Doc. 17 at 23.) But such a presumption does not mean the agency can forgo its obligation to consider the environmental impacts of a project or that temporary roads can be excluded from the analysis. To the contrary, the Eastside Assessment specifically states "[t]he specific situation should be addressed at the project level." F1_446:0032209. The Forest Service's own science states that "[a]ny motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicle and all uses, including administrative uses." F1_71:0013045. Thus, temporary roads are an "important aspect of the problem" by the agency's own measure. *Motor Vehicle*, 463 U.S. at 43. And it was arbitrary and capricious for the Forest Service to represent that "[t]he Eastside Assessment states that temporary routes can be

reasonably excluded from this analysis." *See* B2c:0005527. Even so, the Forest Service maintains that further analysis of habitat effectiveness was not necessary because "this project proposes no changes to the 2007 Travel Plan decision," B2b:0005229, and the record adequately explains that temporary roads will only have a negligible effect on habitat effectiveness. Neither argument is persuasive.

In regard to tiering to the Travel Plan, the Final EIS conditions its reliance on the fact "that no new roads are proposed with this vegetation management project, and temporary road use will not exceed administrative levels." B2b:0005230. Thus, the effectiveness of this tiering—and NFMA compliance— depends on whether the agency did in fact adequately consider temporary roads. This conclusion is consistent with two previous decisions of this Court. *See Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1067 (D. Mont. 2013) (remanding for agency to provide "a full and fair discussion of the impact that temporary roads will have on elk during the Project's lifetime"); *Native Ecosystems Council v. Weldon*, 848 F. Supp. 2d 1207, 1219 (D. Mont. 2012), *vacated due to mootness*, 2012 WL 5986475 (D. Mont. Nov. 20, 2012) ("Neither the 1993 nor the 2002 papers from Christensen and Lyon suggest that temporary roads constructed during a timber sale are immune from concerns related to elk habitat and viability. Indeed, the opposite is true[.]").

The Forest Service insists, however, that unlike the situation in either *Krueger* or *Weldon*, this record contains a discussion of temporary roads, upon which it was reasonable for the agency to conclude they would have a minimal effect. According to the Forest Service, temporary roads only "have the potential to diminish the quality of elk habitat if the level of use associated with that route exceeds administrative levels." G2_3:0035690. The Forest Service therefore concluded that because "[t]he level of use on administrative temporary routes in the Castles project is not anticipated to exceed administrative levels, . . . there would be no measurable effect on elk use of the area associated with that use." G2_3:0035690. The agency also explained that "any temporary roads needed to treat units will not be open to the public and will be decommissioned and removed after implementation . . . ; therefore, any impact on big game due to temporary routes used for project activities would be immeasurable and insignificant." B2b:0005257.

Plaintiffs criticize this analysis on many levels, first challenging the Forest Service's reliance on an internal memo that post-dates the Draft EIS and Final EIS and was not subject to public comment. The memo is dated November 4, 2019 and titled "Clarification to the Castle Mountains Restoration Project Big Game Report Alternative 5 (preferred alternative)." *See* G2_3:0035690–91. While it undisputedly provides the most direct analysis of temporary roads, Plaintiffs insist

20

that the agency cannot rely on this non-NEPA document to bolster the analysis in the Final EIS.  *See League of Wilderness Defs. v. U.S. Forest Serv.*, 549 F.3d 1211, 1219 (9th Cir. 2008) (holding cumulative effects analysis insufficient "because it cannot tier to a non-NEPA document").  The Forest Service maintains, however, that the memo merely clarifies what is in the EIS and that the EIS does not need to contain all supporting information.  While the Forest Service is correct that an EIS need not restate studies and science, "the public must be adequately informed of the probable significant environmental impacts by an impact statement." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1284 (9th Cir. 1974).  Thus, the EIS must contain an "adequate" discussion of temporary roads; it does not.

Though the Forest Service characterizes the Final EIS as containing a "thorough[]" discussion of temporary roads, (Doc. 17 at 12), the primary cited page of the EIS merely states: "Based on the Eastside Assessment, temporary or administrative routes can be reasonably excluded from the analyses; therefore, any impact to big game due to temporary routes used for project activities would be immeasurable and insignificant."  B2b:0005257.  As discussed above, this conclusion is premised on a misrepresentation of the Eastside Assessment.  "To take the required "hard look" under NEPA, "an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council*, 418 F.3d at 964 (citing 40 C.F.R. § 1500.1(b)); *see also Nat. Res. Def. Council v. U.S. Forest Serv.*,

421 F.3d 797, 811 (9th Cir. 2005) ("Where the information in the initial EIS is so

incomplete or misleading that the decisionmaker and the public could not make an

informed comparison of the alternatives, revision of an EIS may be necessary to

provide a reasonable, good faith, and objective presentation of the subjects

required by NEPA.")

Nor do other parts of the Final EIS provide the necessary support.  (*See* Doc.

23 at 13.)  The cited material states that "skid trail rehabilitation and road

decommissioning and storage on haul routes" will have short term direct effects

and possible long term indirect effects on goshawk, B2b:0005288; "[t]emporary

haul routes would, in the short term, add to the cumulative forest edge effect [on

migratory birds] but would be re-vegetated overtime," B2b:0005283; construction

of temporary roads is expected to cause "destruction of nests or direct mortality of

adult or juvenile [migratory] birds," B2b:0005275; temporary roads may displace

lynx, but the impacts will be limited by low volume and road speeds, as well as

"[r]estricting temporary roads to project activities only," B2b:0005339–40;

temporary roads will have undefined short term direct effects on big-eared bats,

B2b:0005389; and temporary roads "are not expected to be a barrier to wolverine

movements," B2b:0005404.  But this information merely reinforces the proposition

that temporary roads *do* in fact have a cognizable impact on the environment

within the Project area.  And, as it relates to Plaintiffs' primary elk challenge under

22

the Eastside Assessment, the cited language once again relies on the incorrect

conclusion that temporary roads need not be considered in the elk context,

B2c:0005527, 5545, especially if they only reach administrative use levels,

B2b:0005252, 5257.

Moreover, Plaintiffs present compelling record evidence that elk habitat

effectiveness levels are not currently being met in the Project area and that those

levels will only worsen during Project implementation.  Pursuant to the Eastside

Assessment, "[i]n those areas where there is a desire to improve and/or maintain

elk habitat use, we recommend maintaining or decreasing road densities that

correspond with the desired habitat effectiveness level per Christensen et al.

(1993)."  F1_446:0032208.  "For areas intended to benefit elk summer range and

retain high elk use, habitat effectiveness related to motorized routes should be 70%

or greater."  F1_446:0032208.  On the other hand, "[f]or areas where elk are one of

the primary resource considerations habitat effectiveness should be 50% or

greater."  F1_446:0032208.  "In situations involving elk summer range where

habitat effectiveness is less than 50% elk use potential (which equates to an open

motorized density of about 2 miles/square mile), these areas must be recognized as

making only minor contributions to elk management goals."  F1_446:0032208

(citations omitted).  Nevertheless, the Eastside Assessment specifically

"recognize[s] that due to the [Forest Service]'s multiple use mandate . . . there will

23

be areas that are managed for habitat effectiveness of less than 50% elk use potential." F1_446:0032208. In Forest Management Area C, the Forest Plan has identified "[m]aintain[ing] or enhanc[ing] existing elk habitat by maximizing habitat effectiveness as a primary management objective." A1:0000121. Accordingly, habitat effectiveness "should be 50% or greater" in those parts of the Project area that fall within Management Area C.[1] F1_446:0032208.

According to Plaintiffs, the current habitat effectiveness is between 34% and 38% based on total mileage of roads and the size of the Project area, depending on whether the calculation includes the 52.1 miles of "jeep trails." (*See* Doc. 14 at 13–14.) And that percentage only gets worse after Project implementation, as the Project authorizes 45.1 miles of new road construction or reconstruction: (1) 9.7 miles of new road construction of temporary roads, (2) 25.7 miles of road reconstruction, and (3) construction of an additional 9.7 miles of new roads on existing trails. B5a:0005789. Thus, the record indicates that habitat effectiveness levels are being violated in the status quo, let alone under the proposed Project. It is difficult to assess the accuracy of Plaintiffs' contention, however, as the Final

---

[1] At oral argument, the Forest Service implied that because the 50% standard is limited to Management Area C, the alleged violation of the 50% standard across the Project area was overstated. However, it appears that at least over one-fourth of the Project area is considered Management Area C, *see* B2b:0005453, and contains the second-highest amount of total road miles, *see* H11:0055857.

24

EIS admits to containing no analysis of this issue.  Accordingly, supplemental analysis is required for both NFMA and NEPA compliance.

### C.     Road Density

Plaintiffs present additional challenges to the Forest Service's consideration of road density, arguing that the Project violates road density standards in specific areas without adequate explanation and fails to disclose accurate existing road conditions.  The bedrock of the road density analysis in the Project EIS is, once again, the 2007 Travel Plan.  Plaintiffs argue that there is no indication that the 2007 Travel Plan "accurately reflects the true existing condition of roads on this landscape." (Doc. 14 at 25.)  In response, the Forest Service insists that "Plaintiffs present no persuasive evidence that the Travel Plan has not been implemented to such an extent that it was unreasonable for the Service to base the road density calculation on it." (Doc. 17 at 29.)  Plaintiffs have the better argument.

The 2021 Biological Assessment for the "Ongoing Travel Plan" indicates that only approximately 40% of the decision miles have been implemented.  *See* H29:0056306.  The Forest Service's only real response to this is that the Travel Plan data is extra-record.  But, as argued by Plaintiffs, both the ROD and Biological Assessment for the Travel Plan are in the record, *see* H9:0055731–820; H29:0056299–317, and, more importantly, the Project is actually tiered to them.  Additionally, the Project EIS itself reflects implementation concerns.  The EIS

concedes that "in many places, recovery has been slow, road templates remain, and unauthorized motorize use continues, and in some cases, expands off existing templates." B2b:0005161.  The Forest Service emphasizes that the "slow recovery" is associated with "unused closed roads," B2b:0005161, and "[t]he management area direction for roads management refers to public access," *see* B2b:0005234.  But reliance on the Travel Plan includes reliance on the Travel Plan's designation of and the restrictions placed on certain routes.  If more use is occurring than contemplated in those designations, the impacts to the environment exceed the assumptions made by the agency in this record.

And while the parties disagree on the actual road density based on the underlying data, *compare* H11:0055875–917 *with* G2_16:0038014, that dispute merely emphasizes the failure of a clear record on the existing road density, and the agency's resultant inability to take a hard look at the Project's impacts and its compliance with road density limits.  The agency cannot avoid this review simply by asserting that the Project creates no new "permanent" roads.  While the agency may ultimately be correct that Project roads do not contribute to the road density calculation, that conclusion must be assessed against an accurate road density baseline.  Because it was arbitrary and capricious for the agency to rely on assumptive conditions that are belied by the facts in the record and on the ground,

remand is required for the agency to assess existing road conditions, recognizing the actual—not aspirational—implementation of the Travel Plan.

## D.    Montana Fish, Wildlife and Parks' Concerns

Finally, Plaintiffs argue the Project violates NEPA because the EIS does not disclose state agency concerns about road density and lack of security in the Project area.  Under NEPA, "the agency shall discuss [in the draft EIS] all major points of view on the environmental impacts of the alternatives including the proposed action."  40 C.F.R. § 1502.9(b).  Additionally, "[t]he agency shall discuss any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9(c).  The failure to do so is a violation of NEPA.  *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003).

Here, Montana Fish, Wildlife and Parks submitted scoping comments in May 2015 recommending that the Forest Service follow the Eastside Assessment and maintain effective closures for temporary roads.  *See* E28:0010173–74; *see also* E11:0010131–33 (2013 comments).  Plaintiffs argue that the Forest Service violated NEPA by not addressing those comments in the Final EIS.  *See* B2c:0005493–5577 ("Appendix C Response to Comments").  According to the Forest Service, "this view is not opposing and was submitted only as a scoping comment during the development phase of the Project, not as a comment during

the actual comment period." (Doc. 17 at 31.) Although the Forest Service's response is lackluster, the State did not pursue these concerns through the entire administrative process. This is a Pyrrhic victory for the agency, however, as it must now address on remand concerns the State identified early in the process.

## III. Goshawk

Plaintiffs further argue that the Project EIS fails to comply with the Forest Plan requirements for goshawk, a designated management indicator species for old growth forest. A1:0000347; *see also* B2b:0005364. The Forest Plan requires the Forest Service to annually monitor goshawk nests with a 100% sample and report "active nesting territories." A1:0000323 (Item C-8). The Forest Plan mandates that the "Variability Which Would Initiate Further Evaluation" is a "Decrease of 10% or more in active nesting territories." A1:0000323 (Item C-8). Additionally, the Forest Plan states that the "[e]valuation of data gathered during the monitoring will be guided by the Decision Flow Diagram," A1:0000319, and the resulting "evaluation report will be made available for public review," A1:0000320. Plaintiffs argue that the EIS failed to disclose a decline in active goshawk nesting territory and the Forest Service failed to conduct the requisite evaluation report in response to the decline. In response, the Forest Service argues (1) Plaintiffs' claim is not a reviewable site-specific challenge and (2) even if it proceeds to the merits, Plaintiffs' claim fails because the Forest Service considered the "relevant factors"

28

in evaluating a greater-than-10 percent decrease in goshawk occupancy in 2017.

Neither of the agency's arguments is persuasive.

### A.      Site-Specific Challenge

The Forest Service first argues that the failure to produce a report on forest-wide decline of the goshawk is not a "site-specific" challenge appropriate for review.  "Forest-wide management practices and monitoring efforts, or lack thereof, are generally not amenable to suit under the APA because they do not constitute final agency actions." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009).  Thus, a "plaintiff must allege a 'specific connection' between the challenged site-specific action and the general practice." *Id.* (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998)); *see Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1067–68 (9th Cir. 2002) (referencing a "causal connection" between the alleged mismanagement and the action).

Nevertheless, Plaintiffs insist that their reporting challenge is tied specifically to the Castle Mountains Project because the Project will remove 6,559 acres of goshawk post-fledgling habitat and 8,807 acres of goshawk foraging habitat.  B2b:0005302; *see also* B2b:0005313 ("[The Project] would alter goshawk habitat.").  There are also "eleven known goshawk territories in the project boundary," B2b:0005292, and the proposed action alternatives are anticipated to affect 20 to 30% of the "existing nesting habitat," *see* B2b:0005305–06, 5311–12.

29

Thus, while there may be a Forest-wide decline, there is site-specific harm as well. *See Weldon*, 697 F.3d at 1058 ("We find sufficient site-specific connection here because stand treatment has been shown to affect goshawk nesting territories, and the Project requires significant stand treatment in known goshawk nesting territories."). In *Neighbors of Cuddy Mountain*, the Ninth Circuit explained that a challenge to "forest monitoring practices alone" is different from an allegation that an agency "fail[ed] to monitor species viability as required by NFMA [and that failure] renders a specific final agency action . . . unlawful." 303 F.3d at 1068. Because Plaintiffs' allegation is more akin to the latter, there is a sufficient nexus between the Project and the agency's alleged failures to proceed on this claim.

## B.     Goshawk Decline

The EIS states that the Project complies with the Forest Plan monitoring requirements because, in reference to the 10% decrease trigger, "there has been no such decrease in active nesting territories, see Northern Goshawk Monitoring Summary 2016 in project record." B2b:0005313. But, according to Plaintiffs, this is counter to evidence that shows a 47% decline in active nests in 2018 and a 60% decline in active nests in 2017. (*See* Doc. 14 at 39–40.) Rather than acknowledge this decline, however, Plaintiffs argue that the Forest Service "actively misrepresents its own data and misleads the public in the Project EIS" in stating that "there has been no such decrease in active nesting territories." (Doc. 14 at 41

(quoting B2b:0005313).) In response, the Forest Service concedes there was a decline in 2017 but disputes the decline in 2018. (*See* Doc. 17 at 35.) Plaintiffs insist even this limited concession warrants remand. They are correct.

There is no real question that the EIS's representation that "there has been no such decrease [a decrease of 10% or more] in active nesting territories," B2b:0005313, is directly contradicted by the reports of declining territories in 2017, *see* G2_129:0039410. Nor do the agency's justifications in this case temper that misrepresentation. While the Forest Service is correct that the EIS accurately summarizes the final report for 2007 to 2016, *see* G2_139:0039439–44, that summary is, as Plaintiffs argue, misleading in light of the 2017 data in the record. The Forest Service further argues that there is no harm here because even with declines, the EIS explains that there will continue to be adequate post-fledging and foraging habitat after Project implementation. *See* B2b:0005303. The Forest Service also states that "[t]he Project EIS likewise explains that the Project does not affect goshawk nesting habitat. AR0005305–06." (Doc. 23 at 28.) But that assertion contradicts the cited material, which explicitly states that all the alternatives would affect a percentage of nesting habitat. *See* B2b:0005305–06. To be sure, the EIS says that "more than the minimum amount of nesting habitat" will remain following project implementation, B2b:0005305, but that is not the same as the Project having *no effect* on such habitat. As a result, neither the EIS

31

nor the Forest Service's post hoc rationalizations reflect the reality of declining goshawk nesting territories. Remand is therefore required on these grounds.

Plaintiffs further argue that the Forest Service did not produce a public evaluation report for the 2017 and 2018 goshawk active nesting territory declines, as required by the plain language of the Forest Plan. *See* A1:0000323 (Item C-8). The Forest Service argues that the 2017 decline can be attributed to natural conditions and weather, meaning neither further evaluation nor the preparation of an evaluation report was necessary. But even so, the Forest Service argues that "the forest plan does not dictate the form that the evaluation must take," (Doc. 23 at 30), and an internal email addressing the 2017 decline is sufficient here. The agency is wrong on both points.

The Forest Service first argues that an evaluation report was not required because the decline can be attributed to natural conditions and weather, citing *Native Ecosystems Council v. Weldon*. That argument, however, puts the cart before the horse. In *Weldon*, the Ninth Circuit determined the Forest Service met its "further evaluation" obligation as it relates to goshawk decline where the evaluation itself specifically attributed the decline to weather. *See* 697 F.3d at 1058–59. The important takeaway was that, unlike the situation here, the Forest Service did in fact prepare an evaluation report and that report contained the Forest Service's analysis. *See id.* Here, the agency claims the cause is natural based on

32

an internal agency email.  To be sure, the cited document attributes the decline to a number of natural phenomena, including "dryer weather," "consecutive good [reproductive] years," and "reduced prey base compounded by last year's drought."  G2_133:0039418.  And, Plaintiffs have recognized the email's author as qualified in this field.  *See* G2_114:0039267.  But that email also states that the above causes are "only [a] 'guess,'" and the author "can prove none of this" as they are "[j]ust . . . educated impressions."  G2_133:0039418.  The email also recommends further consultation with another goshawk expert.  G2_133:0039418.  This severely undercuts the agency's second argument, or its attempt to characterize this email as an "evaluation" of the goshawk decline.

Ultimately, while the Forest Service is correct that the Forest Plan dictates neither the form of the report nor the relevant considerations, the record here does not show that the agency complied with either NFMA or NEPA in relation to the undisputed decline in goshawk nesting territory.  Remand is therefore required on these grounds as well.

## IV.   Roadless Rule (Claim Six)

Plaintiffs' final challenges are based on the Roadless Rule.  On January 12, 2001, the Forest Service published the final Roadless Rule, which prohibits road construction and tree cutting in designated "Inventoried Roadless Areas" subject to limited exceptions.  *See* 66 Fed. Reg. 3244 (Jan. 12, 2001).  In this case, the

33

western portion of the Project is located within the Castle Mountains Inventoried Roadless Area. B2b:0004747. "Approximately 37 percent (29,498 acres) of the total project area (79,790 acres) is located within the Castle Mountains inventoried Roadless Areas." B2b:0005131. The Project permits tree-cutting in this Area across 2,889 acres as follows: 1,780 acres for "meadow restoration," 845 acres for "whitebark pine restoration," 13 acres for "aspen restoration," and 41 acres of "stand improvement thinning."[2] B2b:0004804; *see also* B5a:0005803–806. In support of these activities, the Forest Service determined two exceptions to the Roadless Rule's prohibition on the cutting, sale, or removal of timber from roadless areas apply: small diameter timber and cutting incidental to allowed management activities. *See* 36 C.F.R. § 294.13(b)(1)(ii), (2) (2005). Because the proposed treatments are exempted under § 294.13(b)(1)(ii), the Court does not reach the application of the "incidental" exception under § 294.13(b)(2).

Tree-cutting is permitted in an Inventoried Roadless Area when "[t]he cutting, sale or removal of generally small diameter timber . . . is needed . . . [t]o maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of

---

[2] The Project also authorizes 3,320 acres of prescribed burning in the Inventoried Roadless Area. B2b:0004804; *see also* B5a:0005803–806, 5816. Plaintiffs do not, however, challenge the prescribed burning. (*See* Doc. 27.)

the current climatic period." 36 C.F.R. § 294.13(b)(1)(ii).  The Forest Service

argues that both the "meadows restoration" and the "whitebark pine restoration"

fall within this exception.  Plaintiffs disagree, arguing "restoration" efforts are not

needed because the existing conditions in both areas are within the estimated

natural historic range.  For example, as it relates to the "meadow," Plaintiffs argue

grasslands/shrublands currently constitute 24.6% of the area, which falls within the

natural range of variability of 14.4% to 92.0% in the Castle Mountains.  *See*

D1a:0005957; B2b:0004820.  Likewise, whitebark pine currently constitutes 3.6%

of the area and its natural range of variability is 0.3% and 0.8%.  *See*

D1a:0005957; *but see* B2b:0004820 (indicating current percentage is 0.8%).

        While the Forest Service posits "historical average" is a better representation

of "historic range of variation," the more persuasive argument is that the exception

is met even under Plaintiffs' definition.  While Plaintiffs insist there can be no

"need" for tree cutting so long as the current percentages are within the historic

range, they themselves argue that the percentages are a range, not a brightline.  So

long as the cutting or removal of trees "maintain[s] or restore[s] the characteristics

of ecosystem composition and structure" and the resulting percentages are still

within historic range of variation, the exception can be justified.  And it has been

here.  The stated purpose of the Project

        is to move the Castle Mountains toward a more resilient forest and
        grassland ecosystem that would address the departure in fire regime

condition class and reduce the future threat of high intensity wildfire. There is a need to restore the mosaic vegetation size class and fuel structure across the landscape that would be more resilient to disturbance over time. Implementation of treatments would provide additional diversity in size classes and species and reduce conifer encroachment in nature meadow openings.

B2b:0004815. Thus, the Forest Service has shown that tree cutting associated with the Project is necessary here to improve wildfire resiliency consistent with the terms of the Roadless Rule. *See* 36 C.F.R. § 294.11 (2005) (defining the roadless area characteristics). Accordingly, "meadow restoration" and "whitebark pine restoration" activities are exempted under § 294.13(b)(1)(ii).[3] Summary judgment is therefore granted in favor of the agency on Claim Six.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the Forest Service's motion for summary judgment (Doc. 16) is GRANTED as to Claims Two, Three, Four, and Six, as well as the illegal roads portion of Claim One. Plaintiffs' motion for summary judgment (Doc. 13) is GRANTED as to the remainder of Claim One and the entirety of Claim Five. The matter is REMANDED to the agency for further analysis and the Project is ENJOINED pending the agency's compliance with both NFMA and NEPA as outlined above.

---

[3] Plaintiffs do not challenge "aspen restoration" on this ground. (*See* Doc. 14 at 49.) Thus, the agency may rely on § 294.13(b)(1)(ii) for those treatments as well.

DATED this 4ᵗʰ day of April, 2022.

15:00 P.M.

_____
Donald W. Molloy, District Judge
United States District Court